**Mark BRINKMAN et al.,
Plaintiffs-Appellants,**

v.

**John J. GILLIGAN, Governor of the
State of Ohio, et al.,
Defendants-Appellees.**

**No. 75–1410.**

United States Court of Appeals,
Sixth Circuit.

June 24, 1975.

Louis R. Lucas, Ratner, Sugarmon, Lucas & Salky, Memphis, Tenn., Nathaniel Jones, New York City, John A. Dziamba, Willimantic, Conn., Richard Austin, Dayton, Ohio, Paul R. Dimond, Washington, D. C., for plaintiffs-appellants.

John D. Holschuh, Columbus, Ohio, David C. Greer, Bieser, Greer & Landis, Asher Bogin, Dayton, Ohio, Thomas Martin, Asst. Atty. Gen., Columbus, Ohio, for defendants-appellees.

Before PHILLIPS, Chief Judge, and PECK and MILLER, Circuit Judges.

PHILLIPS, Chief Judge.

For a second time this court is called upon to review the constitutionality of a

plan ordered by the District Court for the school system of Dayton, Ohio, to remedy cumulative constitutional violations found to exist in that school system. Reference is made to the previous decision of this court, reported at 503 F.2d 684 (6th Cir. 1974), for a detailed recitation of facts and issues.

By a statute enacted February 22, 1887, the State of Ohio abolished separate schools for white and Negro children. Nevertheless, the District Court found that the Dayton school system has failed in many particulars to meet the standards of Ohio law mandating an integrated school system and to comply with the equal protection clause of the fourteenth amendment. Segregative acts and practices were found to have occurred both before and after the decision of the Supreme Court in *Brown* v. *Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and to have continued down to the present time. These findings of fact as to segregative practices in Dayton are set forth in detail in our former opinion and will not be repeated here. Suffice it to say that in our former opinion this court ruled that the findings of fact of the District Court as to unconstitutional practices on the part of Dayton School officials are not clearly erroneous, but to the contrary are supported by substantial evidence.

Although the phrase "de jure" does not appear in our former opinion, the meaning of that decision is that the Dayton school system has been and is guilty of de jure segregation practices. *See Keyes* v. *School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

We agreed with the District Court as to his findings of fact in our former opinion, but held the remedy ordered by that court to be inadequate, considering the scope of the constitutional violations. We remanded the case to the District Court with directions to formulate a desegregation plan for the Dayton school system consistent with the remedial guidelines outlined in *Keyes, supra,* and

in *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

In our former opinion we said:

Once the plaintiffs-appellants have shown that state-imposed segregation existed at the time of *Brown* (or any point thereafter), school authorities "automatically assume an affirmative duty . . . to eliminate from the public schools within their school system 'all vestiges of state-imposed school segregation.'" *Keyes, supra,* 413 U.S. at 200, 93 S.Ct. at 2693. When such a showing has been made, "racially neutral" plans which fail to counteract the continuing effects of past school segregation are inadequate. *Id.* at 210–213, 93 S.Ct. 2686. 503 F.2d at 704.

On remand the District Court required the plaintiffs and the Board of Education to submit plans. The plaintiffs' plan was rejected. The Board's plan was adopted for the school year 1975–76 with minor modifications.

The present appeal is from the decision of the District Court implementing the Board's plan. The question on appeal is whether the Board's plan conforms to the mandate of this court in our decision reported at 503 F.2d 684. We hold that it does not.

The plan approved by the District Court contains some provisions which apparently might effect some improvements in the segregated conditions found to exist in this school system. Some of its key features are as follows:

1. The closing of Roosevelt High School, with its 100 per cent black enrollment. The students previously enrolled at Roosevelt High would be permitted to attend any high school of their choice.

2. Creation of a downtown magnet high school at the Central YMCA, with programs not offered at home high schools, to serve a maximum of 300 students at any one time, and satellite magnet programs intended to attract stu-

dents from their high schools and districts of residence, which could serve not more than 375 students at any one time. The District Court said: "If successful, the magnet program will provide an opportunity to students, both black and white, to obtain additional educational advantages equally attractive to both." The students would remain in their assigned schools for all other instruction.

3. Creation of three magnet learning centers at which elementary students could participate in foreign language, career motivation, and business education programs. The three centers together would serve about 880 students, who would remain in their assigned schools for other instruction.

4. Expansion of science centers to accommodate additional elementary students. The centers would have a racially balanced enrollment, and attendance would be mandatory, but only ten percent of the student's total instruction time would be spent at the centers.

5. A new vocational school for high school students, known as Kiser Career Center, would be established. This school would have a balanced racial composition, serving 210 students on a free-choice basis.

6. Restructuring of Miami Chapel elementary school into an alternative elementary school with enrollment optional and on a full-time basis. Miami Chapel has a capacity of over 700 students, but the Board anticipates that the school as restructured will serve approximately 500 students. Miami Chapel presently is an all-black school serving 380 students, and there is some indication in the record that these students, if not admitted to the restructured school, will be assigned to the all-black Louise Troy or Wogaman schools.

7. Creation of a magnet alternative school for 150 intermediate grade level students in an attempt to keep potential drop-outs in school, without regard to race.

8. The freedom of enrollment and open enrollment programs put into effect earlier by the Board would be continued.

In approving this plan, the District Court added the following provisions:

1. All programs including the magnet schools and the learning centers must be so located that the burden of transportation is substantially equal upon both black and white students;

2. The composition of all classes must be no less than the mean for the appropriate schools plus or minus 15%;

3. The faculty assigned to all programs must reflect the racial percentages of faculty within the system as a whole;

4. The amount of time of student assignment to classes in learning centers shall not be less than 20% of such student's total instructional time.

This is essentially all the relief afforded by the District Court for the 1975–76 school year. The court expressed uncertainty as to whether the plan would be completely effective and ordered the Board to develop and file a more comprehensive plan by January 1, 1976. The court stated that if the 1975–76 plan should prove to be ineffective, an alternate plan would be instituted for the school year beginning in September 1976.

■ The District Court described the approved plan as "desegregative in intent" and concluded that it would have "an integrative effect." It appears that the plan contains some significant curricular innovations and that it would be a step toward integration of the Dayton school system. We believe, however, that more is required by the Constitution, by recent decisions of the Supreme Court, including those herein cited, and by the previous mandate of this court. As the appellants point out, under the plan approved by the District Court the basic pattern of one-race schools will continue largely unabated. The plan does not even purport to dismantle Day-

ton's one-race schools other than Miami Chapel and Roosevelt High School, and even if the magnet plans are successful, the vast majority of one-race schools will remain identifiable as such. The District Court's plan fails to eliminate the continuing effects of past segregation and is, therefore, inadequate.

■ In the course of his opinion, the District Judge noted two events which have occurred since our first opinion in this case, both of which he thought supported the narrow remedy he ordered on remand.

The District Court said:

First: Effective October 20, 1974, the Congress of the United States adopted the Equal Educational Opportunities Act, 20 U.S.C. § 1701 *et seq.*

Section 1701 declares it to be the policy of the United States that:

"1. All children enrolled in public schools are entitled to equal educational opportunity without regard to race, color, sex, or national origin; and

2. The neighborhood is the appropriate basis for determining public school assignment."

Section 1712 imposes a limitation upon courts in the following language: "In formulating a remedy for a denial of equal educational opportunity or a denial of equal protection of the laws, a court . . . shall seek or impose only such remedies as are essential to correct *particular denials of equal educational opportunity or equal protection of the laws."* [Emphasis added]

In § 1713 is listed a priority of remedies and in § 1714 there is a specific limitation which holds: "No court . . . shall pursuant to § 1713 of this Title order the implementation of a plan that would require the transportation of any student to a school other than the school closest or next closest to his place of residence which provides the appropriate grade level and type of education for such students."

Second: On December 6, 1974, the United States Court of Appeals for the Sixth Circuit decided *George and Carolyn Higgins* v. *Board of Education of the City of Grand Rapids,* (No. 73–2189) [No. 73–2198], 508 F.2d 779 (1974). The Court in *Higgins* followed *Deal* v. *City of Cincinnati Board of Education,* 369 F.2d 55 [6 Cir.], *cert. denied* 389 U.S. 847, [88 S.Ct. 39, 19 L.Ed.2d 114] in these words: *"Deal* [upheld] the constitutionality of retaining neighborhood schools where racial imbalance has not been caused by any discrimination on the part of school officials." [6]

[6] Higgins [508 F.2d 779, on page 791] mentions Brinkman v. Gilligan [6 Cir., 503 F.2d 684] on page 19. This Court respectfully suggests that the following sentence contained therein: "These three findings were held in their cumulative effect to be enough to reflect *de jure* segregation.", requires for full significance an examination of the specific holding of the court.

The Equal Educational Opportunity Act of 1974 by its terms does not prevent the District Court from carrying into effect the previous mandate of this court. 20 U.S.C. § 1702(b) expressly provides:

(b) For the foregoing reasons, it is necessary and proper that the Congress, pursuant to the powers granted to it by the Constitution of the United States, specify appropriate remedies for the elimination of the vestiges of dual school systems, *except that the provisions of this chapter are not intended to modify or diminish the authority of the courts of the United States to enforce fully the fifth and fourteenth amendments to the Constitution of the United States.* (Emphasis supplied.)

We construe the 1974 Act, read as a whole, as not limiting either the nature or the scope of the remedy for constitutional violations in the instant case.

There could be no possible merit in the contention that the opinion of this court in *Higgins,* relating to the school system

of Grand Rapids, Michigan, altered in any way the nature of the cumulative violations described in our former opinion in the present case or the scope of the constitutional remedy required by this court on the remand which we directed in that opinion. The law in the present case is embodied in the opinion of this court reported at 503 F.2d 684. Our previous opinion is not changed in any way by *Higgins,* which dealt with a different school system and a distinguishable factual situation.

Appellants have petitioned for summary reversal. Except for the time factor, we would be inclined to grant this relief. However, it obviously would be difficult if not impossible, in the limited time now available, for the District Court to formulate a comprehensive plan for the 1975–76 school term and to put it into effect in September 1975 without disruption of the large school system in the Dayton school district.

Instead of summary reversal, we remand this case to the District Court with directions to modify the plan previously approved for the 1975–76 school year so as to improve the racial balance before September 1, 1975, in as many of the remaining racially identifiable schools in the Dayton system as feasible.

We further direct that black students who attended the Miami Chapel elementary school during the 1974–75 school year, and who are not assigned to the restructured Miami Chapel school, be assigned to other than all-black schools during the 1975–76 school year.

The District Court already has expressed an intention to adopt a revised and improved plan for the school year 1976–77. On remand we direct that the court adopt a system-wide plan for the 1976–77 school year that will conform to the previous mandate of this court and to the decisions of the Supreme Court in *Keyes* and *Swann.* We direct that this plan be adopted not later than December 31, 1975, so that it may be placed in effect at the beginning of the new school year in September 1976.

This case is remanded to the District Court for further proceedings consistent with this opinion.

The mandate of this court on the present appeal will issue forthwith. The costs of this appeal are taxed against the Dayton Board of Education.